IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

JANE DOE I, as next friend of        )
JANE DOE II,                         )
                                     )
       Plaintiffs,               )
                                     )
v.                                   )        CIVIL ACTION NO. 5:12-CV-468 (MTT)
                                     )
BIBB COUNTY SCHOOL DISTRICT,         )
                                     )
       Defendant.                )
_____     )

## ORDER

      Plaintiffs Jane Doe I, Jane Doe II's parent and natural guardian, and Jane Doe II have sued Defendant Bibb County School District for an alleged violation of Title IX. The Court granted partial summary judgment to the Defendant on the Plaintiffs' "before" theory of Title IX liability. (Doc. 100). That theory was based on the Defendant's conduct before Jane Doe II's sexual assault that allegedly made her more vulnerable to the assault. Now the Defendant has moved for summary judgment on the Plaintiffs' "after" theory of Title IX liability, which pertains to the Defendant's conduct following Jane Doe I's assault. (Doc. 109). For the following reasons, the motion is **GRANTED**.

## I. BACKGROUND

      The remaining theory of Title IX liability in this case concerns Defendant Bibb County School District's ("School District") actions following the sexual assault of Plaintiff Jane Doe II, a student in a school operated by the School District.[1]

---

[1] The factual background is taken from the Defendant's statement of material facts not in dispute and the Plaintiffs' statement of genuinely disputed material facts. (Docs. 112; 128). Rather than responding to each of the Defendant's numbered facts as required by Local Rule 56, the Plaintiffs only enumerate the facts they "specifically dispute" and cross reference multiple paragraphs of their own statement of genuinely disputed facts instead of citing to "particular parts of materials in the record." M.D. Ga. L.R. 56. Nonetheless, the Court has considered both the Plaintiffs' response to the Defendant's statement of

**A.  The School District's Investigation of the Sexual Assault of Jane Doe II**

On January 20, 2012, School District officials received notice of a report alleging

Jane Doe II was sexually assaulted by several male students in a bathroom at

Northeast High School the previous day.[2]  (Docs. 115 at 20:15-17; 87 at 24:2-19; 86 at

16:11-23; 124 at 12:7-22; 79 at 14:21-17:8).[3]  Jane Doe I, the mother of Jane Doe II,

reported the incident to a supervisor in the School District Department of Transportation.

(Docs. 116 at 44:11-45:17; 86 at 17:11-22).  Stephanie Prater, Deputy Chief of the

School District Campus Police Department,[4] received a phone call from the

superintendent's office informing her of the incident at approximately 6 p.m. on January

20.  (Doc. 86 at 16:13-15).  When she learned of the incident, Chief Prater telephoned

Campus Police Detective Cory Goble and dispatched him to meet with Jane Doe II and

officers from the Macon Police Department ("MPD").  (Docs. 86 at 19:22-21:1; 87 at

24:2-25:2; 124 at 12:23-25).  Chief Prater believed that the Campus Police "would work

the case in conjunction with [MPD], but that [Campus Police] would take the lead

because it happened on campus."  (Doc. 86 at 22:5-7).

---

material facts and the Plaintiffs' own statement of genuinely disputed material facts.  As the Plaintiffs acknowledge, the great majority of their purportedly disputed facts serve to "amplify" or "supplement" the Defendant's facts rather than show the existence of a genuine dispute.  Therefore, while the Court has considered the Plaintiffs' facts which are supported by appropriate record citation, they are not always incorporated into the statement of facts.

The Defendant has objected to almost all of the Plaintiffs' facts on one or more grounds.  However, many of the Defendant's objections pertain either to the entry of a Rule 56(g) order (which, as discussed below, is not procedurally proper) or pertain specifically to the use of the evidence at trial and not for the Court's consideration for purposes of deciding the motion.  While the Court has considered all of the Defendant's objections, a specific ruling on each objection is not necessary.

[2] In the portions of the depositions cited by the Defendant for this undisputed fact, the school officials do not actually mention being made aware of the precise details of Jane Doe II's assault at this time, i.e., that it was in the bathroom and that there were several students involved.  However, it is clear the officials received notice of the details the following day.

[3] Citations to depositions are to the deposition pages numbers, regardless of whether they correspond to the CM/ECF page numbers.

[4] The School District has its own police department.  At the time of the incident, Prater was the interim chief.  (Doc. 86 at 22:25-23:3).

Detective Goble met with Jane Doe I and Jane Doe II at the Medical Center of Central Georgia, where he took Jane Doe II's statement.  (Docs. 87 at 25:3-4, 26:2-5; 124 at 14:6-16).  However, Detective Goble deferred detailed questioning to the professional interviewers at the Crescent House.[5]  (Docs. 87 at 26:5-8; 124 at 14:14-16).  During Detective Goble's interview, Jane Doe II provided him with the first name of one of the male students involved in the incident.  (Doc. 87 at 26:8-10).  Detective Goble then accessed a school database while he was at the Medical Center in an attempt to identify the male student.  (Doc. 87 at 29:7-25).  Courtney Stephens, a forensic interviewer with the Crescent House, later interviewed Jane Doe II, and her account of the incident was consistent with what she earlier told Detective Goble.  (Doc. 87 at 47:22-50:8).

Sometime after midnight on January 21, 2012, Detective Goble took possession of an evidence kit from a medical examination of Jane Doe II and called Chief Prater to tell her he believed there was probable cause for an arrest.  (Doc. 87 at 30:14-31:15, 32:7-18).  Based on conversations with MPD detectives at the Medical Center, Detective Goble and Chief Prater believed MPD would send someone from their Juvenile Unit to assist with the investigation.  (Docs. 87 at 28:14-22; 86 at 28:8-12).  At the time Detective Goble called Chief Prater, however, no one from the Juvenile Unit had arrived.  (Docs. 87 at 32:18-33:6; 86 at 28:8-12).  Because they did not want to delay the investigation, Chief Prater authorized Detective Goble to continue investigating over the weekend with the assistance of other Campus Police officers.  (Docs. 87 at 32:13-20; 86 at 28:12-20; 124 at 26:19-24).  The goal was to have arrests

---

[5] The Parties never get around to saying what the Crescent House is.  But, as known to the Court, and implicit in the Parties' briefing, the Crescent House provides services to children who are victims of abuse.

made before Monday when students would return to school.  (Doc. 86 at 28:12-20, 31:4-6).

Dr. Quintin Green, the principal of Northeast High School, and Dr. Jeffery Ashley, one of the assistant principals, met at the school on Saturday (January 21) to review the school's surveillance videos in connection with the incident.  (Doc. 79 at 17:4-18:17). By Monday, January 23, Detective Goble had arrested five of the seven male students involved in the incident.  (Docs. 86 at 39:13-20, 61:1-15; 113, ¶¶ 6, 11, 16, 22, 28).  All seven of the male students had been arrested and placed into custody less than a week after the incident.  (Docs. 86 at 41:9-42:1, 61:1-13; 113, ¶¶ 34, 40).

On January 23, 2012, Chief Prater received a phone call from Major Tony Williams with the MPD, who then connected her to Deputy Chief Henderson Carswell with the MPD.  (Doc. 86 at 42:3-44:1).  According to Chief Prater, Deputy Chief Carswell informed her that MPD "had a lot more experience with the cases, and sometimes these cases aren't what they seem."  (Doc. 86 at 44:25-45:2).  In response, Chief Prater informed him that the Campus Police Department had been working with the Bibb County District Attorney's Office, had taken five individuals into custody, and that she did not believe they needed the MPD's assistance.  (Doc. 86 at 46:17-21).

On January 26, 2012, Lynn Farmer, a 12-year member of the Bibb County Board of Education ("school board"), sent an email to Romain Dallemand, the then-superintendent, in which she was critical of the decision to have the Campus Police investigate the incident.  (Docs. 114 at 9:17-19; 114-1 at 3).  In the email, she states that having the Campus Police investigate is a "plaintiff attorney's dream come true," and she expresses concern about further liability because the School District had just settled a lawsuit involving another special education student at Northeast High School.

(Doc. 114-1 at 3).  She is also apprehensive that any pitfalls in the investigation will be seen as purposely done to protect the School District and that the School District needs to better control its public relations.  (Doc. 114-1 at 3).

As Farmer's email suggests, the school board had concerns regarding the MPD's lack of involvement in the investigation.  (Doc. 86 at 57:7-15).  Dr. Edward Judie, who as the Deputy Superintendent for Student Affairs was responsible for Title IX compliance, believed "there was a political will to use an outside agency because of a trust issue."  (Doc. 115 at 63:22-23, 85:22-86:8).

On January 31, 2012, Dallemand directed the Campus Police Department to turn the investigation over to MPD.  (Doc. 124 at 35:20-36:1).  That same day, Dallemand emailed school board members and informed them "Deputy Chief Mike Carswell of the [MPD] … has agreed to take over the matter and conduct any further investigation that may be needed."  (Doc. 114-1 at 4).  He also stated, "Until it was brought to my attention by the media, I was under the impression that the MPD was involved. Although the MPD offered to conduct the investigation, I was recently notified that Campus Police made the decision **not** to include MPD."  (Doc. 114-1 at 4).  Chief Prater testified that MPD "excluded themselves, and I just said, you know, thanks but no thanks, we don't need you now."  (Doc. 124 at 39:17-19).

It is undisputed that the public's lack of trust in Dallemand and/or "political" issues with the school board motivated this transfer.[6]  The Defendant frames the "political issue" as being motivated by "the opinion that the MPD had more expertise and that it

---

[6] The Plaintiffs point to other portions of the record they contend "amplif[y]" the fact that "'political' or 'trust' issues … motivat[ed] Defendant's officials to divert the investigation from the Campus Police Department to the [MPD]."  (Doc. 127 at 2).  The Defendant objects to the additional facts, but it does not dispute that "perceived lack of trust of Superintendent Dallemand" and political considerations were the motivating factors behind the transfer.

would be more transparent to have an outside agency investigate the incident." (Doc. 141-1, ¶ 15).  Drawing all reasonable inferences in the Plaintiffs' favor, the record indicates the transfer of the investigation to the MPD was based on how the School District or the superintendent would be perceived rather than an actual problem with the Campus Police investigation.  (Docs. 114-1 at 3; 115 at 57:18-24, 63:20-25, 68:5-9).

In connection with transferring the criminal investigation to MPD, Dallemand accused Chief Prater of failing to keep her supervisors informed during the investigation, and she was suspended with pay for 30 days for that reason.  (Doc. 124 at 40:9-41:4).  The Parties do not dispute for purposes of the motion that Chief Prater had in fact kept her supervisors informed and that she was disciplined because she was not willing to publicly admit failing to communicate with the superintendent.  (Doc. 115 at 56:2-60:12).  Dallemand was apparently concerned with the community's perception of his involvement.  (Doc. 115 at 59:7-17, 62:1-6).

In a somewhat unusual turn of events, the Plaintiffs contend that the Defendant's investigation was reasonable (or at least not clearly unreasonable) up until this point and seek an order pursuant to Fed. R. Civ. P. 56(g)[7] to that effect.  The Plaintiffs concede that no reasonable jury could find the Defendant's actions (leading up to when the investigation was turned over to the MPD) clearly unreasonable.  In fact, the Plaintiffs' "statement of genuinely disputed material facts" includes a section of "material facts not in dispute that demonstrate the reasonableness of the initial investigation by Defendant's campus police department."  Because it is not disputed that the School District initially acted reasonably, the Court finds it unnecessary to include most of the

---

[7] *See infra* Section II.B.

additional facts cited by the Plaintiffs, though the Court has considered them.  Whether the Plaintiffs are entitled to a Rule 56(g) order is discussed below.

The Defendant contends that after transferring the case to the MPD, it continued its own investigation "as to whether any District protocols or procedures were violated at Northeast High School."  (Docs. 112, ¶ 27; 115 at 38:23-39:25).  The Plaintiffs dispute that any investigation "concerned any continued inquiry into what actually happened during the incident."  (Doc. 127 at 2).  They cite testimony from Chief Prater and Dr. Judie about there being no review by the Campus Police of the MPD investigation and there being no further investigation into whether sexual assault actually occurred. (Docs. 124 at 46:5-19, 50:8-12; 115 at 40:1-6, 71:12-72:23).  The Defendant objects to the additional facts but does not dispute for purposes of the motion that it did not review the MPD's investigation or conduct a further criminal investigation after the conclusion of MPD's investigation.  (Doc. 141-1, ¶¶ 20, 21).

### B. Services/Support Provided to Jane Doe II

A couple of days after the incident occurred, Beverly Gosby and Grace Krauss, two members of the School District's crisis response team, went to Jane Doe II's home to offer supportive services and assistance.  (Docs. 116 at 69:24-71:5, 75:7-18; 115 at 93:4-19; 137 at 20:23-22:1).  Gosby informed Jane Doe I she was there to help and to call her if she needed anything.  (Doc. 116 at 78:23-79:1).  Jane Doe I was suspicious of the visit's purpose, and a family advocate advised her not to accept anything the School District was offering.  (Doc. 116 at 75:19-77:19).

Jane Doe I decided not to send Jane Doe II back to Northeast High School, and there was nothing the School District could have done to change her mind.  (Doc. 116 at 80:7-13).  On January 27, 2012, Jane Doe I notified the School District in writing that

Jane Doe II would not be returning to school and requested home-based educational services for Jane Doe II.  (Docs. 116 at 73:10-74:18; 116-1).  That same day, the School District convened an Individual Educational Program ("IEP") meeting to consider the request for home-based educational services for Jane Doe II.  (Docs. 116 at 82:2-84:8; 116-2).  As a result of the meeting, Jane Doe II's IEP was revised to provide for home-based educational services, which began the following week.  (Doc. 116 at 85:14-24).  Jane Doe I agreed with the January 27 IEP.  (Doc. 116 at 86:24-87:2).  The home-based services continued over the summer to help Jane Doe II catch up academically.  (Doc. 116 at 93:16-94:11).  During the 2011-2012 school year, there were no services that Jane Doe I wanted the School District to provide to Jane Doe II which were not provided.  (Doc. 116 at 94:12-20).

It is undisputed that Jane Doe II had no further contact with her alleged attackers after the January 19 incident.  The Defendant contends its provision of home-based services contributed to this lack of contact, citing Jane Doe I's testimony to that effect.  (Doc. 116 at 105:25-106:3).  The Plaintiffs do not appear to dispute this, but they contend this notion is contradicted by the Defendant's factual statements that Jane Doe I had already decided not to send Jane Doe II back to Northeast High School and that there was nothing the Defendant could have done to change her mind.  Even if these statements are contradictory, Jane Doe I did testify both that she decided not to send Jane Doe II back to school *and* that she believed the School District's provision of home-based services helped prevent Jane Doe II from having further contact with her alleged attackers.

At Jane Doe I's request, Gosby helped transfer Jane Doe II's brothers from Northeast High School to Central High School.  (Doc. 116 at 79:2-6).  Jane Doe I did not request further assistance from Gosby.  (Doc. 116 at 81:2-14).

During the 2012-2013 school year, Jane Doe I determined that Jane Doe II was ready to return to a classroom setting.  (Doc. 116 at 96:3-13).  She requested that the School District pay for Jane Doe II to attend Woodfield Academy, a small private school in Macon, Georgia.  (Doc. 116 at 100:1-5).  The School District agreed, and Jane Doe II began attending Woodfield Academy.  (Docs. 116 at 100:1-11; 137 at 32:16-33:14).

Donna Poole, Director of the Program for Exceptional Children, monitored Jane Doe II's progress at Woodfield Academy and understood she was "doing well" and "scheduled to graduate with a regular ed. diploma at the end of the year."  (Doc. 137 at 33:16-20).  The Plaintiffs do not appear to contest the content of the reports Poole received, but they dispute any implication that Jane Doe II will be able to attend college. They cite the affidavit of Becky Sessions, the head of Woodfield Academy, who testified that Jane Doe II's courses were "typical for a student who would not be college bound"; that it would be "possible" for her to apply to a technical college to prepare for occupations such as a beautician or daycare employee; that when she completed her last year at Woodfield Academy she functioned at a sixth to eighth grade level; and that without further training Sessions did not believe Jane Doe II would "be able to function on an independent basis."  (Doc. 133, ¶¶ 3, 4, 6).  The Defendant objects to the additional evidence, contending it is not material and not relevant in light of Jane Doe II's abandonment of her injunctive relief claim.  However, the Defendant does not dispute for purposes of the motion that any post-secondary educational opportunities

available to Jane Doe II would likely include community or vocational/technical college, as opposed to a four-year university.

The Defendant also objects to Sessions's testimony that Woodfield Academy recommended an additional year of training to strengthen Jane Doe II's "basic life skills" but that the Defendant refused to pay for it, contending Sessions does not have personal knowledge regarding the Defendant's willingness to approve an additional year at Woodfield Academy. (Doc. 133, ¶ 5). In support, the Defendant presents an additional affidavit where Sessions clarifies she does not have personal knowledge about whether anyone requested that the School District pay for an additional year or that the School District refused. (Doc. 141-3, ¶¶ 2, 3). Therefore, the Defendant's objection is sustained, and the Court will not consider the portion of Sessions's first affidavit regarding whether the School District denied an additional year at Woodfield.

### C. The School District's Disciplinary Response

On February 10, 2012, School District officials learned Jane Doe II had recanted her prior allegations of rape during the course of an interview by the MPD. (Docs. 87 at 64:14-65:11; 82 at 35:3-36:5; 113, ¶ 45). The School District then learned that the Bibb County District Attorney and the MPD had dropped all charges against the male students. (Docs. 87 at 65:7-11; 82 at 35:11-13). Anticipating the male students would be released from custody, the School District issued a Notice of Disciplinary Action ("charge letter") to each student involved, which prevented them from returning to Northeast High School until either a Student Disciplinary Hearing Officer made a final determination regarding the underlying factual allegations or the students accepted a disciplinary sanction in lieu of a hearing. (Doc. 113, ¶¶ 45-47). The alternative school is a disciplinary placement. (Docs. 82 at 47:9-24, 52:2-53:3; 115 at 52:1-3). None of the

male students involved returned to Northeast High School during the 2011-2012 school year.  (Doc. 113, ¶¶ 9, 14, 20, 26, 32, 38, 44).  Three of the seven male students never returned to Northeast High School following their removal from the school.  (Docs. 82 at 70:16-71:10; 115 at 50:12-21).

In addition to the charge letters issued to the male students, Dr. Green also directed one of his assistant principals to prepare a charge letter for Jane Doe II following her February 10, 2012 recantation.  (Docs. 82 at 33:6-35:2, 41:2-8; 113, ¶¶ 45-46).  It is not disputed for purposes of the motion that the School District did not review the MPD's investigation or conduct further investigation before deciding to send the charge letter to Jane Doe II.  The charge letters referred all of the students involved in the January 19 incident—including Jane Doe II—to a student disciplinary hearing for violating the Code of Student Conduct and suspended them from school pending a resolution of the charges.  (Docs. 82 at 33:6-34:13; 79 at 63:6-11; 113, ¶¶ 45-46).  However, none of the services provided to Jane Doe II following the January 19, 2012 incident were discontinued based on the reports of her alleged recantation to the MPD.  (Docs. 115 at 93:20-24; 113, ¶ 48).  Additionally, Jane Doe II's charge letter explained that students with disabilities are referred to their IEP committee to determine whether the alleged misconduct was a manifestation of the student's disability.  (Doc. 116-3).[8]

Any time a student with a disability, like Jane Doe II, is referred for a student disciplinary hearing based on an alleged violation of the Code of Conduct, the School District conducts a manifestation determination review ("MDR") to determine whether the alleged misconduct was caused by, or had a direct and substantial relationship to, the student's disability.  (Docs. 137 at 23:24-26:6; 113, ¶ 49).  If the IEP team

---

[8] The Defendant cites Exhibit 21 to Dr. Green's deposition, which purports to be Jane Doe II's charge letter, but it appears the exhibits to Dr. Green's deposition were never filed.  However, the charge letter is also included as Exhibit C to Jane Doe I's deposition, which has been filed.  (Doc. 116-3).

determines that a student's alleged misconduct is (or likely is) related to her disability, the student is not subject to the regular discipline process. (Docs. 137 at 22:21-23:5, 31:23-32:12; 82 at 40:14-18). If the IEP team determines that a student's alleged misconduct was not a manifestation of her disability, the student is subject to the same disciplinary process and sanctions for misconduct as a student without a disability. (Docs. 115 at 91:24-92:15; 82 at 48:2-21).

At Jane Doe II's MDR, the IEP team found that "characteristics of her disability could have been specifically related to her making the decision to be involved in or be aware of sexual misconduct." (Doc. 137 at 25:4-7). In other words, the alleged misconduct was a manifestation of her disability. (Doc. 137 at 24:23-25:1). Therefore, the School District was required to respond to the alleged misconduct within the context of Jane Doe II's IEP (as opposed to subjecting her to the regular disciplinary process) regardless of whether the January 19, 2012 incident was consensual. (Doc. 137 at 39:21-40:15). Because of the outcome of the MDR, the School District did not pursue disciplinary charges against Jane Doe II, go forward with the disciplinary hearing, or punish her regarding the January 19 incident. (Docs. 82 at 40:14-18; 116 at 142:23-143:25). Based on the nature of Jane Doe II's disability, the School District's Title IX coordinator concluded that at least some aspect of the January 19 incident was likely unwelcome. (Doc. 115 at 73:14-24, 84:13-84:2, 87:5-88:12).

### D. Other Remedial Measures

In response to the January 19, 2012 incident, the School District's Title IX coordinator hired an outside agency, Safe Havens, to conduct a safety evaluation of the entire school district. (Doc. 115 at 89:14-90:25). The School District also reviewed all of its policies dealing with sexual harassment and student safety. (Doc. 115 at 89:23-

91:7).  Based on the recommendations of the Safe Havens audit, the School District

issued a Student Supervision Administrative Directive ("Safety Directive"), which

addressed classroom and restroom supervision.  (Doc. 85 at 39:6-42:17, 45:12-46:1,

50:13-25, 54:19-21).[9]  The Safety Directive had an express prohibition that students are

never allowed to check out or escort another student from class.  (Doc. 85 at 50:13-25).

Principals and directors received training from the School District regarding the Safety

Directive.  (Doc. 85 at 40:15-23, 41:18-42:13).

    Also in response to the incident, an additional Campus Police officer was

assigned to Northeast High School.  (Docs. 113, ¶ 53; 79 at 53:11-13).  Additionally,

locks were installed on the restroom doors in the building where the incident took place,

and students were given teacher-supervised restroom breaks.  (Docs. 113, ¶ 55; 79 at

53:13-55:24).

## II. DISCUSSION

### A.  Motion for Summary Judgment Standard

    A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on

the evidence presented, "a reasonable jury could return a verdict for the nonmoving

party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir.

2002); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may

support its assertion that a fact is undisputed by "citing to particular parts of materials in

the record, including depositions, documents, electronically stored information, affidavits

---

[9] It does not appear that Exhibit 16 to David Gowan's deposition, which is purportedly the Student
Supervision Administrative Directive, was ever filed, but Gowan testifies about it at length.  Gowan is the
School District's Director of Safety and Risk Management.  (Doc. 85 at 5:2-14).

or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The non-moving party does not satisfy her burden "if the rebuttal evidence is merely colorable, or is not significantly probative of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255.

### B. Fed. R. Civ. P. 56(g)

Pursuant to Fed. R. Civ. P. 56(g), "If the court does not grant all the relief requested by the [summary judgment] motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case." The Plaintiffs request an order "determining for trial that the initial phase of Defendant's Title IX investigation … was reasonable, or at least not clearly unreasonable." (Doc. 125 at 7). The problem with their request is that the Plaintiffs have not moved for summary judgment, which is a precondition to a Rule 56(g) order. *See Selkow v. 7-Eleven, Inc.*, 2012 WL 2054872, at *4-*5 (M.D. Fla.). Even if the Plaintiffs could seek a Rule 56(g) order in response to the

Defendant's motion for summary judgment, it would only be appropriate if the Court first determined the Defendant's motion should be denied or only partially granted. *See* Fed. R. Civ. P. 56(g) advisory committee's note to 2010 amendment ("It becomes relevant only after the court has applied the summary-judgment standard carried forward in subdivision (a) to each claim, defense, or part of a claim or defense, identified by the motion."). However, as discussed below, the Defendant has demonstrated it is entitled to summary judgment.

### C. Analysis of Title IX Claim

Jane Doe I and Jane Doe II have sued the School District pursuant to Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Although Title IX does not expressly authorize a private right of action, the Supreme Court has held that an implied right of action for money damages exists. *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 76 (1992); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979). In certain circumstances, student-on-student sexual harassment can give rise to Title IX liability. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). Such harassment is only actionable if: (1) the defendant is a federal funding recipient; (2) "an appropriate person [has] actual knowledge of the discrimination or harassment the plaintiff alleges occurred"; (3) the defendant is deliberately indifferent to known acts of harassment; and (4) the discrimination is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir.

2007) (internal quotation marks and citations omitted).[10]  A Title IX violation can be

based on deliberate indifference before an attack that makes a plaintiff more vulnerable

to the attack or, in certain circumstances, deliberate indifference after an attack that

causes a plaintiff to endure additional discrimination.  *Ross v. Corp. of Mercer Univ.*,

506 F. Supp. 2d 1325, 1346 (M.D. Ga. 2007).  As discussed above, the remaining

theory of liability in the case is that the School District violated Title IX through its

conduct following Jane Doe II's sexual assault on January 19, 2012.

The School District's motion addresses only two parts of the various

permutations of the test for Title IX liability in the case of a student-on-student sexual

assault.  First, the School District contends it was not deliberately indifferent to known

acts of harassment.  Second, the School District contends Jane Doe II was not

subjected to further Title IX discrimination as a result of any alleged deliberate

indifference.[11]

### 1.  Deliberate Indifference

The School District first argues it is entitled to summary judgment because it was

not deliberately indifferent in response to Jane Doe II's sexual assault.  The Plaintiffs

concede, and thus there is no genuine dispute, that the School District's response was

---

[10] The Plaintiffs seem to argue for a different test for Title IX claims based on a funding recipient's conduct in response to a student-on-student sexual assault and cite to Department of Education ("DOE") guidance to help formulate the elements.  However, the Supreme Court was clear in *Davis* that there are very limited circumstances under which a funding recipient can be liable in a private cause of action under Title IX for student-on-student sexual harassment.  While there may not be as much guidance on how the *Davis* elements apply in an "after" case, it would seem to defy the Supreme Court's holding to apply a different formulation and potentially broaden the scope of Title IX liability.  Additionally, in *Williams* UGA was being sued based on its conduct in recruiting a student athlete with knowledge of his past actions *and* based on its lack of responsiveness following a sexual assault orchestrated by that same student athlete.  The Eleventh Circuit applied the *Davis* test to both timeframes.  *Williams*, 477 F.3d at 1293-99.
[11] Both Parties seem to assume that the harassment was severe, pervasive, and objectively offensive as required for Title IX liability.  The Court notes that "[a] 'single instance of sufficiently severe one-on-one peer harassment' cannot have such a systemic effect in light of 'the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.'" *Hill*, 2015 WL 4747048, at *17 (quoting *Davis*, 526 U.S. at 652-53).  *But see Williams*, 477 F.3d at 1298.  As the Defendant has not moved on this element, however, the Court does not address it.

not deliberately indifferent up until it turned the criminal investigation over to the MPD. Thus, the issue on summary judgment is whether the School District's decision to turn the investigation over to the MPD and the actions it took following that decision were deliberately indifferent.  In the Title IX context, a funding recipient is deliberately indifferent to known acts of student-on-student harassment "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.  Further, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.* at 649.

The Plaintiffs contend the School District's clearly unreasonable response began with its decision to turn the criminal investigation over to the MPD.[12]  Their primary argument is that the School District abdicated its investigatory responsibility under Title IX by not continuing to investigate what actually happened in the restroom, i.e., whether it was consensual, after the MPD's conclusion that Jane Doe II recanted.  They cite to DOE guidance on what a funding recipient's responsibilities are following a student-on-student sexual assault, including guidance that the funding recipient "must promptly investigate *to determine what occurred* and then take appropriate steps to resolve the situation." (Doc. 130 at 5) (emphasis added by Plaintiffs).[13]  What funding recipients'

---

[12] The Plaintiffs also argue in their brief that "[t]he District and its law enforcement unit do not contend that they informed Jane Doe II or her mother, Jane Doe I, that they could file a Title IX complaint with the District and seek an informal hearing with the assistance and under the guidance of a Title IX Coordinator." (Doc. 125 at 3).  In support, they cite to Dr. Judie's 100-page Rule 30(b)(6) deposition with no specific page or line citation.  This fact does not appear in either the Plaintiffs' response to the Defendant's statement of material facts or the Plaintiffs' statement of genuinely disputed material facts. (Docs. 127; 128).

[13] This is a "Dear Colleague Letter" dated April 4, 2011, in which the DOE supplemented its guidance to funding recipients.  (Doc. 130).  This letter is no doubt helpful to funding recipients trying to comply with Title IX, but it is obvious the guidance in this letter is broader than the scope of liability for private causes

responsibilities are under Title IX and what they can be held liable for in a private cause of action for damages, however, are not one and the same.

It is true that the Supreme Court in *Davis* looked to DOE regulations in determining whether a funding recipient had notice it could be liable in a private cause of action for student-on-student sexual harassment. *Davis*, 526 U.S. at 643-44. Importantly, however, the Supreme Court went on to hold that a funding recipient could be liable for student-on-student harassment if its conduct amounted to an *intentional* violation of Title IX. *Id.* at 643 ("We consider here whether the misconduct identified in *Gebser*—deliberate indifference to known acts of harassment—amounts to an intentional violation of Title IX, capable of supporting a private damages action, when the harasser is a student rather than a teacher. We conclude that, in certain limited circumstances, it does."). This is because a funding recipient must have adequate notice of its potential liability in private damages actions for violations of Spending Clause legislation,[14] such as Title IX. *Id.* at 640. The Supreme Court narrowly limited the circumstances under which a funding recipient can be liable in a private action for damages for student-on-student sexual harassment. Clearly, a funding recipient cannot

---

of action for money damages. For example, the letter advises: "If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." (Doc. 130 at 4). Funding recipients are not liable for damages in private causes of action for sexual harassment of which they *should have* known, nor are they required to *eliminate* harassment in order to avoid liability. *See Davis*, 526 U.S. at 648 ("We stress that our conclusion here—that recipients may be liable for their deliberate indifference to known acts of peer sexual harassment—does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action."). In fact, the letter acknowledges as much. (Doc. 130 at 5 n.12).

[14] "When Congress acts pursuant to its spending power, it generates legislation 'much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Davis*, 526 U.S. at 640 (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "In interpreting language in spending legislation, we thus 'insis[t] that Congress speak with a clear voice,' recognizing that '[t]here can, of course, be no knowing acceptance [of the terms of the putative contract] if a State is unaware of the conditions [imposed by the legislation] or is unable to ascertain what is expected of it.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17).

be held liable simply because it did not conduct an appropriate investigation (even if such conduct could expose it to potential administrative action by the DOE).

Perhaps in recognition of that, the Plaintiffs point to what they contend was the Defendant's true reason for shutting down the investigation and referring the matter to the MPD.  They say the School District wanted to discredit its own investigation and seek an alternative conclusion about what occurred by transferring the investigation to the MPD.  Dr. Judie's testimony and emails from school board members suggest the School District turned the investigation over to the MPD for "political" reasons, i.e., the public perception of investigating itself and the public's lack of trust in Dallemand.  As the Plaintiffs point out, Farmer's January 26, 2012 email to Dallemand is evidence that the School District was also concerned about potential liability and that this concern may have informed its decision.

However, there is no evidence to support the Plaintiffs' contention that the School District "affirmatively sought and received a conclusion contrary to [Campus Police's] from the [MPD]."  (Doc. 125 at 14).  The Plaintiffs point to Chief Prater's discipline, which the evidence shows was not warranted.  But the only record evidence concerning this discipline shows Dallemand was worried about whether the public would perceive he was being kept in the loop regarding the Campus Police investigation.  There is nothing to suggest Chief Prater was punished because of the results of the Campus Police investigation (i.e., that Detective Goble concluded Jane Doe II was raped).

Even assuming the School District did not like the results of the Campus Police investigation, there is no evidence that the School District "affirmatively sought" a different result or even that it had reason to believe the MPD would come to a different conclusion than its own Campus Police.  Deliberate indifference is based on how a

funding recipient responds to *known* circumstances.  The School District's decision to turn an essentially completed criminal investigation over to the MPD, while perhaps unnecessary and based on questionable (but not malicious) motives, does not amount to clearly unreasonable conduct because there was no indication the MPD would upset the investigation, and the School District continued providing educational services to Jane Doe II.  Further, the School District did not wait to respond to the harassment after the MPD took over.  It hired an outside company to conduct a safety audit, altered its internal policies, and implemented further safety measures.  Additionally, the male students alleged to have participated in the sexual assault were in custody when the investigation was turned over and thus were not posing a current danger.

The Plaintiffs also point to the School District's decision to issue a charge letter to Jane Doe II after learning she allegedly recanted during her interview with the MPD instead of relying on Campus Police's prior investigation.  However, this fact cannot be considered in isolation because, again, a funding recipient's conduct must be evaluated in light of all known circumstances.  The male students also received charge letters, which prevented them from returning to school upon release from custody.  Further, none of Jane Doe II's educational benefits terminated after she was issued a charge letter, her IEP team immediately evaluated her conduct and determined that any alleged misconduct on her part was a manifestation of her disability, and she was never actually subjected to discipline.  Though it is true that Jane Doe II's charge letter contained a recommendation of expulsion, her educational benefits were never actually terminated, and she was not subject to discipline.  (Doc. 116-3).  Title IX is concerned with ensuring students are not denied educational opportunities or benefits on the basis of sex.  The undisputed facts show that Jane Doe II continued to receive the educational benefits

she wanted and that the School District's actions in issuing charge letters to the male students prevented them from immediately returning to school.  Thus, while issuing the charge letter to Jane Doe II immediately after being informed she recanted by the MPD may not have been the best response, a reasonable jury could not find it was deliberately indifferent within the meaning of Title IX.

### 2.  Further Discrimination

The School District contends that even if it was deliberately indifferent following Jane Doe II's assault, the Plaintiffs have not shown its conduct subjected Jane Doe II to further discrimination.  In *Davis*, the Supreme Court made clear that for Title IX liability to attach, a funding recipient's deliberate indifference "must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it."  526 U.S. at 645 (internal quotation marks and citation omitted).  The Eleventh Circuit, citing this language in *Davis*, has held that "a Title IX plaintiff at the motion to dismiss stage must allege that the Title IX recipient's deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination."  *Williams*, 477 F.3d at 1296.

In *Williams*, the Eleventh Circuit held that the plaintiff sufficiently alleged UGA's[15] deliberate indifference subjected her to further discrimination.  The court looked at two timeframes: UGA's actions before Williams was raped on campus (the "before" timeframe) and UGA's response to the rape (the "after" timeframe).  As to the "before" timeframe, the Eleventh Circuit found: "UGA['s] … failure to inform its student-athletes about the applicable sexual harassment policy and failure to supervise its student-athletes subjected Williams to … further harassment and caused Williams to be the victim of a conspiracy … to sexually assault and rape her."  *Id.*  As to the "after"

---

[15] Both UGA and UGAA were defendants.  For simplicity's sake, the Court collectively refers to them as UGA.

timeframe, "UGA's deliberate indifference was followed by further discrimination, this time in the form of effectively denying Williams an opportunity to continue to attend UGA." *Id.* at 1297.  Specifically, "UGA failed to take any precautions that would prevent future attacks … should Williams have decided to return to UGA, either by, for example, removing from student housing or suspending the alleged assailants, or implementing a more protective sexual harassment policy to deal with future incidents." *Id.*

Thus, it is clear after *Williams* that for a Title IX plaintiff to hold a funding recipient liable for student-on-student sexual harassment there must be evidence the funding recipient's deliberate indifference subjected her to "further discrimination."  It is also clear that, while the "further discrimination" may be sexual harassment the plaintiff experienced, this need not be the case.  The way UGA allegedly acted in the aftermath of Williams's rape effectively prevented her from continuing to attend UGA because of the possibility she would be further harassed if she decided to continue.  This was also a form of discrimination she faced, which was directly attributable to UGA's response to the rape.  For what it is worth, the First Circuit has summed up this portion of the *Williams* decision as follows: "Though removed from the vicinity of her harassers, the victim in *Williams* could still be subject to the *university's* discrimination, which in that case took the form of a failure to take any precautions that would prevent future attacks." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172 (1st Cir. 2007) *rev'd and remanded on other grounds*, 555 U.S. 246 (2009).  The point, it seems, is that the "further discrimination" can be a response on the part of the funding recipient that is so ineffective it bars the victim's access to educational opportunities.

The Eleventh Circuit very recently confirmed this principle in *Hill v. Cundiff*, --- F.3d ---, 2015 WL 4747048 (11th Cir.).

> A clearly unreasonable response causes students to undergo harassment
> or makes them more vulnerable to it. *See Williams*, 477 F.3d at 1295–96.
> To survive a summary judgment motion, a Title IX plaintiff must present
> evidence from which a reasonable jury could conclude the Title IX
> recipient's deliberate indifference to the initial discrimination subjected the
> plaintiff to further discrimination.

*Id.* at *18.  Instead of specifically analyzing whether the school board's response caused the plaintiff to undergo additional discrimination, the Eleventh Circuit first determined a genuine dispute of material fact existed as to whether the school board's conduct was deliberately indifferent and then immediately proceeded into an analysis of whether that deliberately indifferent conduct barred the plaintiff's access to an educational opportunity or benefit.  *Id.* at *18-*21.  In other words, the question in *Hill* was whether the deliberate indifference caused a Title IX deprivation.[16]

Though deliberate indifference and denial of access to an educational opportunity or benefit are separate elements, the Eleventh Circuit in *Hill* cited the same type of conduct found to constitute "further discrimination" in *Williams*: clearly unreasonable conduct that effectively prevented the plaintiff from continuing to attend her school.  *Id.* at *20 ("In light of the incomprehensible rape-bait scheme and the

---

[16] *Hill* bears mention for another reason.  As discussed above, the Defendant did not move for summary judgment based on the severe, pervasive, or objectively offensive element.  When explaining this requirement in *Davis*, the Supreme Court noted that "students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it."  526 U.S. at 651-52.  The Court went on to hold that "in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect."  *Id.* at 652.  Thus, the focus of the severe, pervasive, and objectively offensive element was the student perpetrator's behavior toward the victim.  In *Hill*, the Eleventh Circuit considered additional conduct in determining whether there was sufficient evidence of this element because in that case "the administrators effectively participated in CJC's sexual harassment by setting Doe up in a rape-bait scheme involving CJC in order to 'catch him in the act.'"  2015 WL 4747048, at *17.  Specifically, the court considered: "(1) CJC's past sexual harassment of Doe and others; (2) Doe's complaints about CJC to the Board (through Simpson and Dunaway) to which the Board responded by having Doe participate in a sting operation with CJC; (3) the Board's 'catch in the act' policy that motivated Simpson to conduct, and Dunaway to approve, a rape-bait scheme with CJC as a participant that directly harassed, injured, and impacted Doe further; and (4) after the rape, the Board's utter failure to respond to Doe's traumatic injury and experience orchestrated by the Board."  *Id.* at *17.  Due to the unique circumstances of that case, the Court does not read *Hill* as expanding the relevant conduct to be considered for the severe, pervasive, and objectively offensive element in all Title IX cases based on student-on-student sexual harassment.

resulting severe suffering Doe endured on January 22, combined with the refusal of school personnel to acknowledge the rape or begin implementing new sexual harassment prevention or recordkeeping policies, her withdrawal was reasonable and expected." (citing *Williams*, 477 F.3d at 1297)).  Thus, *Hill* crystalizes what *Williams* already made apparent: "further discrimination" under Title IX can mean a funding recipient's deficient response that effectively bars a victim's access to an educational opportunity or benefit.

In response to the School District's argument that there is no evidence it subjected Jane Doe II to further discrimination, the Plaintiffs point to expert testimony and reports that Jane Doe II's interrogation by the MPD was not done in accordance with accepted protocols and subjected her to further traumatization and emotional distress.[17]  The Plaintiffs further contend "a jury could reasonably conclude that the immediate filing of disciplinary charges against Jane Doe II on the false ground that she had consented, or was even capable of consenting, to the sex acts committed on January 19, 2012, inflicted further emotional harm."  (Doc. 125 at 18).  The Plaintiffs do not explain, however, how further emotional harm is synonymous with further discrimination.  They simply argue the improper MPD interview was "set in motion" by the School District's decision to turn the investigation over.  Even if this is true from a tort causation standpoint, the Plaintiffs do not explain how alleged discrimination by a law enforcement agency not affiliated with a federal funding recipient constitutes *Title IX* discrimination.

---

[17] The Defendant contests the validity of many of these expert opinions and has filed a separate *Daubert* motion to that effect.  (Doc. 111).  Because the Court concludes the Plaintiffs have failed to create a genuine dispute of material fact that Jane Doe II was subjected to further Title IX discrimination even considering these expert opinions, however, the Defendant's motion is moot.

Though being effectively denied access to an educational opportunity or benefit can constitute "further discrimination," the Plaintiffs have not contended, and there is no record evidence, that Jane Doe II was ever effectively denied educational opportunities or benefits.  Jane Doe II received home-based instruction and, when her mother wanted her to return to a classroom setting, the School District paid for her to attend private school.  Jane Doe I clearly testified that she decided Jane Doe II would not return to Northeast High School, and there was nothing the School District could have done to change her mind.  However, even if Jane Doe II had wanted to return to Northeast, there is no indication she would have been effectively barred from doing so.  The seven male students did not return to Northeast High School during the 2011-2012 school year, and the School District altered its policies on student supervision.  This is a far cry from the situations in both *Williams* and *Hill* where there was a risk that if the students continued to attend their former schools they would have been subjected to further sexual harassment.  Therefore, the Court finds the Plaintiffs have failed to create a genuine dispute of material fact that the School District subjected Jane Doe II to further discrimination.

### III. CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment (Doc. 109) is **GRANTED**,[18] and the Defendant's *Daubert* motion (Doc. 111) is **DENIED as moot**.

**SO ORDERED,** this 27th day of August, 2015.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[18] The Plaintiffs agree summary judgment is proper on Jane Doe II's request for injunctive relief.